UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
GEORGE RICHARDS,

                              Plaintiff,

        -against-                                    **MEMORANDUM AND ORDER**
                                                      18-CV-6805 (RRM) (ARL)
UNITED RIVERHEAD TERMINAL INC.,
SCOTT KAMM, JOHN LINDAHL, DANIEL
HAND, JEFF BURNS, TOWN OF RIVERHEAD,
TOWN OF RIVERHEAD POLICE OFFICERS 1–3,
JOHN DOE, and JANE DOE

                              Defendants.
------------------------------------------------------------------x
ROSLYNN R. MAUSKOPF, Chief United States District Judge:

        Plaintiff George Richards brings this action against his employer, United Riverhead

Terminal Inc. ("URT"); four fellow employees; the Town of Riverhead ("Riverhead"); three

unnamed officers employed by the Town of Riverhead Police Department ("RPD"); and two

Doe defendants, alleging violations of 42 U.S.C. §§ 1981, 1983, and 1985, and state law.

Presently before the Court is a motion to dismiss filed by Riverhead on behalf of itself and its

officers.  For the reasons set forth below, the motion is granted and Richards' claims against

Riverhead and the officers are dismissed.

## BACKGROUND

        The following facts are drawn from Richards's second amended complaint ("SAC") and

are assumed to be true for the purposes of this memorandum and order.  Richards is an African-

American man who was born in Guyana.  (SAC (Doc. No. 28) ¶ 24).  In 2004, Richards was

hired to work in Riverhead on an offshore vessel-loading platform which, along with a petroleum

storage facility, has been owned by defendant URT since 2012.  (*Id.* ¶ 26).

In 2013, Richards became Lead Platform Operator.  Thereafter, a Barge Captain referred to Richards as "George of the Jungle."  (SAC ¶ 29.)  Richards complained to his superiors at URT about this comment but no action was taken.  (*Id*. ¶ 30.)

In 2013 and thereafter, Richards was directed to perform menial tasks that were outside of his job description, such as janitorial activities and pulling weeds.  (*Id*. ¶ 31.)  Similarly situated white employees were not directed to perform such tasks without additional pay.  (*Id.*)  For example, defendant Daniel Hand, a Marine Supervisor, once directed Richards, who is an experienced mariner and professional seaman, to clean a garage while white members of the crew were sent to work on the crew boat.  (*Id*. ¶ 32.)  Richards complained about this ongoing treatment to the Terminal Manager, defendant John Lindahl, but no action was taken in response to the complaint.  (*Id.* ¶¶ 32–33.)

In September 2015, defendant Jeff Burns, an Operations Foreman, invited one of his friends, a police officer, to fish off URT's offshore platform.  (*Id*. ¶ 34.)  When he observed the friend, Richards told the man he could not fish from the platform because it was against government regulations.  (*Id.*)  Richards reported the incident to Lindahl and Hand, but no action was taken in response to the complaint.  (*Id*. ¶ 35.)  Shortly after the fishing incident, Burns stopped communicating with Richards and "began to ostracize and retaliate against" him in unspecified ways.  (*Id*. ¶ 36.)  Richards reported this behavior to Lindahl and Hand but, again, no action resulted.  (*Id.*)

On November 29, 2015, Richards entered the URT lunchroom and found a hangman's noose on a coat hanger.  (*Id*. ¶ 37.)  Richards reported this incident to Hand, who assured Richards that a proper investigation would take place and reported the incident to Lindahl.  (*Id.*)  On or about December 5, 2015, Richards – still shaken and frightened over the noose incident –

filed a harassment complaint with the RPD.  (*Id.* ¶ 38.)  According to Richards, the RPD failed to properly investigate the matter or to prosecute those involved in the incident.  (*Id.*)  Richards attributes the RPD's inaction to the fact that Police Chief David J. Hegermiller is both related to Terminal Manager Dan Gianfilla and has some sort of "relationship" with URT's president.  (*Id.* ¶ 39.)

Around February 2016, Richards contacted the Suffolk County Human Rights Commission (the "HRC") because he was not satisfied with how his complaints were handled by his employer and the RPD.  (*Id.* ¶ 40.)  Richards discussed his concerns with Rabbi Moss of the HRC and Moss spoke with URT.  (*Id.* ¶ 41.)   As a result, URT conducted a meeting concerning race awareness for certain employees, but that meeting did little to prevent further discriminatory practices.  (*Id.* ¶¶ 41–42.)   Indeed, thereafter, Richards not only continued to be a target of discrimination but also became a target of retaliation.  (*Id.* ¶¶ 42–43.)  These subsequent developments are not relevant to this Memorandum and Order.

The Instant Action

On November 29, 2018, Richards commenced this civil rights action against URT; its General Manager, Scott Kamm; Lindahl; Hand; the HRC; Riverhead; and two unknown RPD officers: John and Jane Doe.  The original complaint (Doc. No. 1) alleged only three causes of action:  a § 1981 claim against URT; a § 1983 claim against Riverhead, the police officers, and the HRC; and a § 1983 conspiracy claim against all defendants.  On April 19, 2019 – two days after URT filed an answer on behalf of itself and its employees – Richards filed an amended complaint, (Doc. No. 17), naming Burns as a ninth defendant.  However, the amended complaint contained the same three causes of action as the original.  It did not contain claims against Burns,

although it alleged that Burns and the other individual defendants were sued in their individual capacities as well as in their official capacities as members of URT's Board of Directors.

On July 3, 2019, Richards amended his complaint for a second time, dropping the HRC as a defendant but adding three additional Doe Defendants – RPD Officers 1–3 – and several new causes of action.  The SAC retained the § 1981 claim as the first cause of action but added allegations that made it unclear whether this claim was alleged against only URT or against all defendants.  (*See* SAC ¶¶ 56–63.)  The SAC also retained the § 1983 claim as the second cause of action.  This count alleges, among other things, that the RPD and the unnamed officers violated the Equal Protection Clause of the Fourteenth Amendment by failing to properly investigate his complaint regarding the hangman's noose in December 2015 and failing to prosecute the perpetrator(s) of the act.  (SAC ¶ 66.)  Specifically, this count states: "Plaintiff posits that had the racial background of [the] victim been white and had … Riverhead not allowed its relationship with … [URT to] interfere with the investigation and prosecution, the Police Officers would have properly completed an investigation, found racial animus and prosecuted those responsible."  (*Id.* ¶ 67.)  The third cause of action alleges a conspiracy to interfere with civil rights in violation of 42 U.S.C. §§ 1983 and 1985.  Specifically, this cause of action alleges that all defendants conspired to deny him "his right to be free from racial discrimination, harassment, and retaliation."  (*Id.* ¶ 77.)

The SAC also alleges three state-law claims.  The fourth cause of action is for breach of contract against URT.  The fifth cause of action is for intentional infliction of emotional distress against all defendants.  Lastly, the sixth cause of action alleges negligence against all defendants.  (*Id.*  ¶¶ 77–103.)

Riverhead's Motion

Riverhead now moves to dismiss the claims against it and the three unnamed RPD

officers pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.  Riverhead's

Memorandum of Law in Support of the Motion to Dismiss the Second Amended Complaint

("Riverhead's Memo") (Doc. No. 42-1) contains seven points.  The first point seeks to dismiss

the first cause of action, arguing that the SAC fails to state a claim under 42 U.S.C. § 1981

because it does not allege discrimination with respect to one of the activities enumerated in that

statute.  The second point seeks to dismiss Richards' second cause of action, alleging that

Richards has not adequately alleged an equal protection violation under the Fourteenth

Amendment. This point encompasses two distinct arguments: first, that Richards failed to allege

any similarly situated comparators and, second, that Richards has failed to allege that the

selective treatment was based on race.

In the third point, which seeks dismissal of the two conspiracy claims contained in the

third cause of action, Riverhead argues that Richards has not sufficiently alleged facts that

suggest either an agreement to violate Richards' constitutional rights or an underlying

constitutional violation.  Riverhead argues that the SAC contains only conclusory allegations of

conspiracy and does not allege an overt act in furtherance of the conspiracy.

In their fourth point, the Town argues that the remaining three causes of action, which are

the state law claims, should be dismissed.  This point encompasses several arguments, only two

of which are discussed below.  First, Riverhead argues that the acts and omissions allegedly

committed by the Town and its officers are not "so outrageous in character" or "extreme in

degree" to support a claim for intentional infliction of emotional distress.  (Riverhead's Memo at

16.)  Second, Riverhead seeks to dismiss the negligence claims against the municipality and its

employees on the ground that the duty alleged breached by RPD was a duty owed to the general public, not a special duty owed to Richards. (*Id.*)

In point five, Riverhead, citing to *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978), argues that Richards has failed to allege a basis for municipally liability because the SAC does not allege that the constitutional deprivation he suffered from arose from a town policy, custom, or practice. In point six, Riverhead argues that the RPD Officers are entitled to qualified immunity with respect to the § 1983 claims because the officers' alleged conduct did not violate clearly established constitutional rights of which the officers should have been aware. Finally, in point seven, Riverhead argues that the SAC should be dismissed with prejudice and without leave to amend because Richards has already filed three complaints and has had ample opportunities to correct the defects in his pleading.

In Plaintiff's Memorandum in Opposition to Riverhead's Motion to Dismiss ("Opposition Memo") (Doc. No. 43), Richards clarifies that his first cause of action is brought solely against URT, not against the Town Defendants. (Opposition Memo at 2.) Richards opposes the Town Defendants' motion in all other respects.

## STANDARD OF REVIEW

Federal Rules of Civil Procedure 12(b)(6) allows the Court to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). Under Rule 12(b)(6), a complaint should be dismissed only if it does not contain sufficient allegations of fact to state claim for relief that is "plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, (2007). This "plausibility standard" is guided by two working principles. *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (*citing Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). First,

"although 'a court must accept as true all of the allegations contained in a complaint,' that 'tenet' 'is inapplicable to legal conclusions,' and '[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.'" *Id.*  Second, "'only a complaint that states a plausible claim for relief survives a motion to dismiss,' and '[d]etermining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *Id.* (quoting *Ashcroft*, 556 .U.S. at 679).

## DISCUSSION

### I.    The § 1981 Claim

Although the first point of Riverhead's motion contains arguments relating to the § 1981 claim, the Opposition Memo states that the first cause of action is brought solely against URT. Accordingly, there is no need to consider the first point raised in Riverhead's Memo, which seeks to dismiss this cause of action as to Riverhead and its officers.

### II.   The § 1983 Claim

In order to maintain a § 1983 action, a plaintiff must allege two essential elements.  First, "the conduct complained of must have been committed by a person acting under color of state law." *Pitchell v. Callan*, 13 F.3d 545, 547 (2d Cir. 1994) (citation omitted).  Second, "the conduct complained of must have deprived a person of rights, privileges or immunities secured by the Constitution or laws of the United States." *Id*.  Section 1983 "does not create a federal right or benefit; it simply provides a mechanism for enforcing a right or benefit established elsewhere." *Morris-Hayes v. Bd. of Educ. of Chester Union Free Sch. Dist.*, 423 F.3d 153, 159 (2d Cir. 2005) (citing *Oklahoma City v. Tuttle*, 471 U.S. 808, 816 (1985)).

The first step in analyzing a § 1983 claim is to identify the specific federal right allegedly infringed. *See Albright v. Oliver*, 510 U.S. 266, 269 (1994). Thus, before analyzing Riverhead's arguments with respect to Richards' § 1983 claim, the Court must determine which Constitutional violation underlies the SAC's second cause of action.

Riverhead begins its second point by citing cases for the proposition that an individual does not have a Constitutional right to have his or her complaints investigated by the police or to have a prosecution commenced on the basis of those complaints. Riverhead's Memo at 7 (citing *McCullough v. Syracuse Police Dep't*, No. 15-CV-638 (DNH) (TWD), 2015 WL 5057472, at *2 (N.D.N.Y. June 5, 2015), *report and recommendation adopted*, 2015 WL 5062370 (N.D.N.Y. Aug. 26, 2015). The Court agrees that this proposition is well established. *See, e.g.*, *Naples v. Stefanelli*, 972 F. Supp. 2d 373, 388 (E.D.N.Y. 2013) (crime victims "do not have a constitutionally protected right to a government investigation of alleged wrongdoing"); *Lewis v. Gallivan*, 315 F. Supp. 2d 313, 316 (W.D.N.Y. 2004) ("[T]he law is well settled that no private citizen has a constitutional right to bring a criminal complaint against another individual.") Accordingly, to the extent that Richards' § 1983 claims is advancing a theory that the RPD violated his Constitutional rights by failing to investigate or prosecute, that theory is without merit.

As Riverhead itself recognizes, however, Richards' § 1983 claim principally alleges a violation of the Equal Protection Clause of the Fourteenth Amendment. This clause, which states that "[n]o State shall ... deny to any person within its jurisdiction the equal protection of the laws," is "essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (citing *Plyler v. Doe*, 457 U.S. 202, 216 (1982)). While the State need not investigate and prosecute every complaint,

it "may not … selectively deny its protective services to certain disfavored minorities without violating the Equal Protection Clause." *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 197 n.3 (1989) (citing *Yick Wo v. Hopkins*, 118 U.S. 356 (1886)).

There are two distinct types of equal protection claims that may be brought in cases involving selective enforcement: *LeClair* claims and *Olech* claims.  The former claims are modeled on *LeClair v. Saunders*, 627 F.2d 606 (2d Cir. 1980), the case in which Second Circuit "first articulated a theory of Equal Protection based on the selective enforcement of the law." *Hu v. City of New York*, 927 F.3d 81, 91 (2d Cir. 2019).  "To prevail on such a claim, a plaintiff must prove that '(1) the person, compared with others similarly situated, was selectively treated, and (2) the selective treatment was motivated by an intention to discriminate on the basis of impermissible considerations, such as race or religion, to punish or inhibit the exercise of constitutional rights, or by a malicious or bad faith intent to injure the person.'" *Id.* (quoting *Zahra v. Town of Southold*, 48 F.3d 674, 683 (2d Cir. 1995)).  "A plaintiff cannot merely rest on 'a demonstration of different treatment from persons similarly situated,'" however; "he must 'prove that the disparate treatment was caused by the impermissible motivation.'" *Hu*, 927 F.3d at 91 (quoting *Bizzarro v. Miranda*, 394 F.3d 82, 87 (2d Cir. 2005)).  "*LeClair* protects against both discrimination on the basis of a plaintiff's protected status (*e.g.*, race or a constitutionally-protected activity) and discrimination on the basis of a defendant's personal malice or ill will towards a plaintiff." *Hu*, 927 F.3d at 91.

In *Village of Willowbrook v. Olech*, 528 U.S. 562 (2000) (*per curiam*), the Supreme Court addressed the latter type of discrimination (*i.e.*, discrimination based on personal malice) and "articulated what has become known as the 'class of one' theory of Equal Protection." *Hu*, 927 F.3d at 91.  In that case, the Supreme Court held that a plaintiff who did "not allege

membership in a class or group" could nonetheless state an Equal Protection claim by alleging "[1] that she has been intentionally treated differently from others similarly situated and [2] that there is no rational basis for the difference in treatment." *Olech*, 528 U.S. at 564. Although "*Olech* declined to specify the degree of similarity required between a plaintiff and her comparator," *Hu*, 927 F.3d at 91–92, the Second Circuit subsequently held that "[i]n order to succeed on a 'class of one' claim, the level of similarity between plaintiffs and the persons with whom they compare themselves must be extremely high." *Neilson v. D'Angelis*, 409 F.3d 100, 104 (2d Cir. 2005), *overruled on other grounds by Appel v. Spiridon*, 531 F.3d 138, 139 (2d Cir. 2008)). "More precisely, a plaintiff must establish that he and a comparator are '*prima facie* identical' by showing that '(i) no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy; and (ii) the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the defendant acted on the basis of a mistake.'" *Hu*, 927 F.3d at 92 (quoting *Neilson*, 409 F.3d at 105).

The pleading standards for *LeClair* and *Olech* claims differ. To state a *LeClair* claim, "a plaintiff must allege facts showing that: (1) he was treated differently from similarly situated individuals and (2) that the difference in or discriminatory treatment was based on 'impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.'" *Holley v. Cook*, No. 20-CV-170 (MPS), 2020 WL 2494761, at *7 (D. Conn. May 14, 2020) (quoting *Diesel v. Town of Lewisboro*, 232 F.3d 92, 103 (2d Cir. 2000)). "To satisfy this standard, … plaintiffs must plausibly allege facts showing a 'reasonably close resemblance' between themselves and a proffered comparator." *Hsin v. City of New York*, 779 F. App'x 12, 15 (2d Cir. 2019) (quoting

*Graham v. Long Island R.R.*, 230 F.3d 34, 40 (2d Cir. 2000)). "[T]he plaintiff's and comparator's circumstances must bear a reasonably close resemblance," *Brown v. Daikin Am. Inc.*, 756 F.3d 219, 230 (2d Cir. 2014) (internal quotation marks omitted); they "need not, however, be 'identical.'" *Hu*, 927 F.3d at 96. *Olech* claims, in contrast, are "subjected to a more stringent similarity standard than class-based discrimination claims." *Id.* at 94. To state an *Olech* claim, "the plaintiff must plausibly allege that he or she has been intentionally treated differently from others similarly situated and no rational basis exists for that different treatment." *Progressive Credit Union v. City of New York*, 889 F.3d 40, 49 (2d Cir. 2018).

In arguing that Richards has not stated an equal protection claim, Riverhead fails to acknowledge the distinct pleading standards, urging the Court to apply the stringent *Olech* similarity standard rather than the *LeClair* standard. For example, Riverhead relies on *Five Borough Bicycle Club v. City of New York*, 684 F. Supp. 2d 423 (S.D.N.Y. 2010), for the proposition that

> 'the level of similarity between plaintiffs and the persons with whom they compare themselves must be extremely high.' '[S]imilarly situated' means 'similarly situated in all material aspects.' And while '[e]xact correlation is neither likely nor necessary,' the 'cases must be fair congeners.'

684 F. Supp. 2d at 439 (internal citations omitted).

The Court does not perceive the SAC's second cause of action as advancing a "class of one" equal protection claim, and therefore declines to follow the standard set forth in *Five Borough Bicycle Club*. However, the Court finds that the second cause of action does not state a claim even under the less exacting *LeClair* standard. First, the SAC does not allege any facts, plausible or otherwise, showing a "reasonably close resemblance" between Richards and a proffered comparator. *See Hsin*, 779 F. App'x at 15. Indeed, the pleading makes no mention of

a comparator but merely "posits that had the racial background of [the] victim been white," the RPD would have investigated Richards' complaint. (SAC ¶ 67.) Second, the SAC does not allege that the RPD's failure to investigate and prosecute was based on 'impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.'" *Holley*, 2020 WL 2494761, at *7. Rather, the pleading principally alleges that Riverhead "allowed its relationship with … [URT to] interfere with the investigation and prosecution," and that absent these relationships, "the Police Officers would have properly completed an investigation, found racial animus and prosecuted those responsible." (SAC ¶ 67.) While the pleading alleges, on information and belief, that unspecified individual defendants had racial motivations for covering up the wrongdoing at URT, (*see* SAC ¶ 73), these allegations are clearly speculative, especially with respect to the as-yet-unidentified RPD officers.

Although the Opposition Memo specifically requests permission to amend the SAC if that pleadings' allegations are deemed insufficient to state a claim, (Opp. Memo at 10), it would be futile to grant leave to amend this cause of action. The allegations in the SAC itself make it clear that Richards is only speculating that race played a role in the RPD's inactivity. The Opposition Memo does not suggest that Richards can proffer a valid comparator. While it mentions that the wife of the Riverhead Town Attorney once generated a "racist, hate-fueled Facebook post," (Opp. Memo. at 5), it does not allege that anyone filed a police complaint regarding this post, or that the RPD failed to take action because of the wife's race.

Similarly, while the Opposition Memo suggests that Richards might want to add a substantive due process claim against Riverhead and its police officers, neither the SAC nor the allegations in the Opposition Memo suggest a basis for such a claim. "In order to establish a

violation of a right to substantive due process, a plaintiff must demonstrate not only government action but also that the government action was 'so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.'" *Pena v. DePrisco*, 432 F.3d 98, 112 (2d Cir. 2005) (quoting *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8 (1998)).  The RPD's failure to investigate and prosecute Richards' complaint in this case does not rise to that lofty level. Accordingly, Richards' § 1983 claim against Riverhead and the unnamed officers is dismissed with prejudice.

III.    The Conspiracy Claims

Richards third cause of action alleges conspiracies in violation of 42 U.S.C. §§ 1983 and 1985(3).  "To state a conspiracy claim in violation of constitutional rights under § 1983, a plaintiff must allege: '(1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages.'" *Barnes v. Cty. of Monroe*, 85 F. Supp. 3d 696, 726 (W.D.N.Y. 2015) (quoting *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999)). "In order to make out a Section 1985(3) claim, 'the plaintiff must allege and prove four elements: (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States.'" *Robinson v. Allstate Ins. Co.*, 508 F. App'x 7, 9 (2d Cir. 2013) (quoting *United Bhd. of Carpenters v. Scott*, 463 U.S. 825, 828–29 (1983)).

The SAC does not allege facts sufficient to state a conspiracy claim under either § 1983 or § 1985(3).  First, "[t]o withstand a motion to dismiss a § 1983 or § 1985(3) conspiracy claim,

a plaintiff 'must provide some factual basis supporting a meeting of the minds, such as that

defendants entered into an agreement, express or tacit, to achieve the unlawful end,' augmented

by 'some details of time and place and the alleged effects of the conspiracy.'" *K.D. ex rel.*

*Duncan v. White Plains Sch. Dist.*, 921 F. Supp. 2d 197, 208–09 (S.D.N.Y. 2013) (quoting

*Romer v. Morgenthau*, 119 F. Supp. 2d 346, 363 (S.D.N.Y. 2000)).  "A plaintiff is not required

to list the place and date of defendants['] meetings and the summary of their conversations when

he pleads conspiracy, but the pleadings must present facts tending to show agreement and

concerted action." *Fisk v. Letterman*, 401 F. Supp. 2d 362, 376 (S.D.N.Y. 2005) (internal

citation and quotation marks omitted).  "'[C]omplaints containing only conclusory, vague, or

general allegations that the defendants have engaged in a conspiracy to deprive the plaintiff of

his constitutional rights are properly dismissed; diffuse and expansive allegations are

insufficient, unless amplified by specific instances of misconduct.'" *Corsini v. Nast*, 613 F.

App'x 1, 3 (2d Cir. 2015) (summary order) (quoting *Ciambriello v. County of Nassau*, 292 F.3d

307, 325 (2d Cir. 2002)).

Here, as in *Corsini*, plaintiff's pleading contains only conclusory, vague, or general

allegations.  In arguing the contrary, Richards' Opposition Memo quotes two paragraphs of the

SAC:  1) paragraph 39, which contains the allegations that Police Chief Hegermiller is related to

Terminal Manager Gianfilla and has some unspecified "relationship" with URT's president, and

2) paragraph 68, which contains allegations that Riverhead and the unnamed officers "used their

authorities to deprive the Plaintiff of federally protected rights."  *See* Opp. Memo at 7.  However,

neither of these paragraphs allege facts suggesting that Riverhead or the unnamed officers

entered into any type of agreement or provide any "details of time and place … of the

conspiracy.'" *See K.D. ex rel. Duncan*, 921 F. Supp. 2d at 208–09; *Romer*, 119 F.Supp.2d at 363.

The SAC also fails to allege other facts necessary to state a conspiracy claim under § 1983 or § 1985(3). Since "a plaintiff alleging a § 1983 conspiracy claim must prove an actual violation of constitutional rights," *Singer v. Fulton Cty. Sheriff*, 63 F.3d 110, 119 (2d Cir. 1995), "[a] valid claim of conspiracy under [Section] 1983 to violate a complainant's constitutional rights must contain allegations [demonstrating an] … actual deprivation of constitutional rights." *Singer v. City of New York*, 417 F. Supp. 3d 297, 327–28 (S.D.N.Y. 2019) (quoting *Romer*, 119 F. Supp. 2d at 363). In other words, "the Complaint must adequately allege a violation of the right or rights that defendants are alleged to have conspired to violate." *K.D. ex rel. Duncan*, 921 F. Supp. 2d at 209. As discussed in section II, above, Richards has not adequately alleged facts suggesting that Riverhead violated his constitutional rights. Accordingly, the § 1983 conspiracy claims fails on this ground as well.

Section 1985(3) requires that "there … be some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action." *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971). Thus, "[i]n order to plead a cognizable civil rights conspiracy claim under § 1985(3), a plaintiff is also required to allege that she was a member of a protected class, and that the conspirators acted with a class-based, 'invidiously discriminatory motivation.'" *K.D. ex rel. Duncan*, 921 F. Supp. 2d at 209 (quoting *Griffin*, 403 U.S. at 102). In this case, the SAC alleges that Richards was an African-American of Guyanan descent but fails to allege facts suggesting that the RPD failed to investigate his complaint because of his race or nationality. To the contrary, the SAC's allegations suggest that Richards himself believes the inaction was due to Chief Hegermiller's relationships with high-ranking URT employees. This failure to allege

15

facts suggesting racial discrimination, along with the failure to allege facts suggesting any agreement between defendants, dooms Richards § 1985(3) conspiracy claim.

IV.    <u>Intentional Infliction of Emotional Distress</u>

Under New York law, a claim for intentional infliction of emotional distress ("IIED") requires a showing of (1) extreme and outrageous conduct; (2) intent to cause, or reckless disregard of a substantial probability of severe emotional distress.  *See Howell v. New York Post Co.*, 81 N.Y.2d 115, 121 (1993). "As New York's highest court has observed, the standard for stating a valid claim of intentional infliction of emotional distress is 'rigorous, and difficult to satisfy.'"  *Conboy v. AT & T Corp.*, 241 F.3d 242, 258 (2d Cir. 2001) (quoting *Howell*, 81 N.Y.2d at 122).  "'Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society.'"  *Stuto v. Fleishman*, 164 F.3d 820, 827 (2d Cir. 1999) (quoting *Howell*, 81 N.Y.2d at 122).  "The Second Circuit has looked to New York state courts for guidance as to what conduct rises to the level of IIED, and has found that IIED claims are only sustained when they involve 'some combination of public humiliation, false accusations of criminal or heinous conduct, verbal abuse or harassment, permanent loss of employment, or conduct contrary to public policy.'"  *Mestecky v. New York City Dep't of Educ.*, No. 13-CV-4302 (CBA) (VMS), 2018 WL 10509483, at *9 (E.D.N.Y. Sept. 7, 2018) (quoting *Stuto*, 164 F.3d at 828 (surveying New York state court IIED cases)).

"Ordinarily, the failure to respond appropriately to complaints of harassment, on its own, will not be sufficiently egregious—'outrageous'—to amount to intentional infliction of emotional distress under New York law."  *Turley v. ISG Lackawanna, Inc.*, 774 F.3d 140, 161 (2d Cir. 2014) (collecting cases).  "General bureaucratic unresponsiveness, lethargy, or a failure

16

to understand the gravity of a situation, although objectionable, is rarely if ever considered so beyond the pale as to reach the extreme threshold necessary for an IIED claim." *Id.* The SAC does not allege facts to suggest that the RPD's failure to take action on Richards' complaint was extraordinary or outrageous in any respect.

In addition, the SAC does not allege facts to suggest that Richards suffered "severe emotional distress" or that the police either 1) intended to cause severe emotional distress or 2) acted in "reckless disregard of a substantial probability of severe emotional distress." *Howell*, 81 N.Y.2d at 121. To the contrary, as discussed above, the SAC implies that Richards believes the RPD's failure to act was attributable to Chief Hegermiller relationships with URT's president and Terminal Manager Gianfilla. And no reasonable juror could find that the failure to investigate, standing alone, would pose a substantial probability of severe emotional distress. Accordingly, Richards' claim against Riverhead and the RPD officers for intentional infliction of emotional distress is dismissed.

V.   Negligence

"When a negligence claim is asserted against a municipality or its employees, the threshold inquiry is 'whether the municipal entity was engaged in a proprietary function or acted in a governmental capacity at the time the claim arose.'" *Velez v. City of New York*, 730 F.3d 128, 134 (2d Cir. 2013) (quoting *Applewhite v. Accuhealth, Inc.*, 21 N.Y.3d 420, 425 (2013)). A municipality performs a "proprietary role when its activities essentially substitute for or supplement traditionally private enterprises," *Applewhite*, 21 N.Y.3d at 425 (internal quotation marks and citations omitted), and performs a governmental function when its acts are "undertaken for the protection and safety of the public pursuant to the general police powers." *Sebastian v. New York*, 93 N.Y.2d 790, 793 (1999) (internal quotation marks omitted).

"Providing police protection has long been recognized as a quintessential governmental function." *Velez*, 730 F.3d at 135 (citing *Valdez v. City of New York*, 18 N.Y.3d 69, 75 (2011)).

"Where, as here, a municipality undoubtedly acts in a governmental capacity, a plaintiff may not recover without proving that the municipality owed a 'special duty' to the injured party." *Id.* "The core principle is that to sustain liability against a municipality, the duty breached must be more than that owed the public generally." *Id.* (internal quotation marks and alteration omitted). "To establish a special relationship beyond the duty that is owed to the public generally, four elements must be present:

> (1) an assumption by the municipality, through promises or actions, of an affirmative duty to act on behalf of the party who was injured; (2) knowledge on the part of the municipality's agents that inaction could lead to harm; (3) some form of direct contact between the municipality's agents and the injured party; and (4) that party's justifiable reliance on the municipality's affirmative undertaking.

*Id.* (quoting *Applewhite*, 21 N.Y.3d at 430–31). "The plaintiff bears the burden of proving a special relationship, and 'where the plaintiff fails to meet this burden, the analysis ends and liability may not be imputed to the municipality that acted in a governmental capacity.'" *Id.* (quoting *Applewhite*, 21 N.Y.3d at 426).

In this case, the SAC does not allege that Riverhead or the RPD assumed a "special duty" or had a "special relationship" with Richards. To the contrary, the SAC makes it clear that Richards simply filed a criminal complaint, as might any ordinary citizen. The police had no greater duty to Richards "than that owed the public generally." *Velez*, 730 F.3d at 135; *see Valdez*, 18 N.Y.3d at 75. Accordingly, the SAC does not state a claim for negligence against Riverhead or its employees. *See id.*

**CONCLUSION**

For the reasons set forth above, Riverhead's motion to dismiss all claims brought against the Town and its police officers is granted.  The Town of Riverhead, Riverhead Police Officers 1–3, and John and Jane Doe are dismissed from this action.  The action shall continue with respect the remaining defendants – United Riverhead Terminal, Inc., and its employees:  Scott Kamm, John Lindahl, Daniel Hand, and Jeff Burns.  This action is re-committed to the assigned magistrate judge for all remaining pretrial proceedings, including settlement discussions as appropriate.

SO ORDERED.

Dated: Brooklyn, New York
       September 28, 2020

*Roslynn R. Mauskopf*

_____
ROSLYNN R. MAUSKOPF
Chief United States District Judge